IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| AXEL ENRIQUE CAMPOS ARROYO, ) | |
| ) | CASE NO: _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| LAMM FARMS, LLC, ) | COMPLAINT |
| ALVARADO'S HARVESTING, LLC, ) | |
| REAL CONSTRUCTIONS, LLC, ) | |
| UNKNOWN DEFENDANT, and ) | |
| RAUL GONZALEZ, ) | |
| ) | JURY TRIAL |
| ) | DEMANDED |
| Defendants. ) | |
| ) | |

<u>PRELIMINARY STATEMENT</u>

1.  This is an action by a foreign migrant agricultural worker who lawfully entered the United States pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program") to perform labor harvesting various crops in North Carolina for several of Defendants during the 2022 agricultural season.

2.  Defendant Lamm Farms, LLC, through its labor contractors Alvarado's Harvesting, LLC and Raul Gonzalez, targeted foreign farmworkers in Mexico who they could convince to pay large recruitment fees for the opportunity to work lawfully in the U.S., using false promises about the wages and working conditions that would be provided.

PAGE 1

3. The Defendants' labor contractors' fraudulent recruitment scheme left Plaintiff in severe debt resulting from the unlawfully charged recruitment fees and for expenses those Defendants required Plaintiff to pay to travel to work for them on North Carolina farms.

4. When Plaintiff left his hometown in Mexico to travel hundreds of miles to North Carolina, Defendants Alvarado's Harvesting, LLC, Lamm Farms, LLC and Raul Gonzalez then exploited Plaintiff's indebtedness, and cultivated a climate of fear to compel Plaintiff's labor against his will at various North Carolina farms owned and operated by Defendant Lamm Farms, LLC, and off-contract work in construction for Defendants Real constructions, LLC, Unknown Defendant, Alvarado's Harvesting, LLC and Raul Gonzalez.

5. Axel Enrique Campos Arroyo ("Plaintiff" or "Campos Arroyo") brings this action against Lamm Farms, LLC, Alvarado's Harvesting, LLC, Raul Gonzalez, Unknown Defendant, and Real Constructions, LLC (collectively "Defendants"), for unpaid wages, including claims for unpaid promised wages and unpaid overtime wages, pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, et seq., and claims for promised wages under the North Carolina Wage and Hour Act (NCWHA), N.C. Gen. Stat. §§ 95-25.1, et seq.

6. Plaintiff also brings a state common law claim for breach of his H-2A contract.

7. Plaintiff further brings a claim under the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), 18 U.S.C. §§ 1581 et seq., as the victim of trafficking and forced labor as prohibited by the TVPRA.

8. Finally, Plaintiff also asserts supplemental state law claims under the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq and state common law claims for fraudulent inducement and negligent misrepresentation in relation to

PAGE 2

Defendants' false and misleading promises to employ him in exclusively agricultural work and to pay him in accordance with the terms of the H-2A job order.

<u>JURISDICTION</u>

9. This Court has federal subject-matter jurisdiction over this matter as conferred by 28 U.S.C. §§ 1331 and 1337, as this action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq and 18 U.S.C. § 1595(a), as this action arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595.

10. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction of Plaintiff's North Carolina state law claims, as they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

<u>VENUE</u>

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in Nash and Wilson and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiff's claims were committed within the jurisdiction of the Eastern District of North Carolina. *See* 28 U.S.C. § 113(a).

<u>PARTIES</u>

13. Plaintiff Campos Arroyo is a natural person who at all times material to this Complaint lived and worked in North Carolina.

PAGE 3

14. Plaintiff Campos Arroyo is a citizen of Mexico who was lawfully admitted to the U.S. on a temporary basis with a visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ( the "H-2A Program") to perform agricultural work for Defendants in 2022.

15. Defendant Lamm Farms, LLC ("Lamm Farms") is a limited liability company organized and registered to conduct business in the state of North Carolina. Process may be served upon its registered agent, Ronald H. Lamm, at 6505 Old Raleigh Road, Sims, NC, 27880.

16. Unknown Defendant is a is a general contractor who employed Plaintiff to perform construction work on a high school located in Apex, NC.

17. Defendant Real Constructions, LLC ("Real Constructions"), is a limited liability company organized and registered to do business in the state of North Carolina. Process may be served on its registered agent, Victor Manuel Martinez Garcia, at 5002 Archers Road NW, Wilson, NC 27896.

18. Defendant Alvarado's Harvesting LLC ("Alvarado") is a limited liability corporation organized under the laws of the state of North Carolina which conducts business in North Carolina. Process may be served on its registered agent, Beatriz Mandujano Alvarado, at 17034 Camp Charles Road, Bailey, NC 27807.

19. Defendant Raul Gonzalez ("Gonzalez") is a natural person doing business as Alvarado's Harvesting LLC in North Carolina.

20. At all times relevant to this Complaint, Defendants Lamm Farms, Alvarado, and Gonzalez (collectively the "Agricultural Defendants") all exercised the authority to direct, control, and supervise the work of Plaintiff Campos Arroyo, with respect to all agricultural work he performed.

21. At all times relevant to this Complaint, Defendants BMI, Real Constructions, Alvarado and Gonzalez (collectively the "Construction Defendants") all exercised the authority to direct, control, and supervise the construction work performed by Plaintiff.

22. Defendant Gonzalez operates his farm labor contracting business under the name Alvarado's Harvesting LLC.

23. At all times relevant to this Complaint, Defendant Lamm Farms was an employer of H-2A workers, including the Plaintiff, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5), with respect to the agricultural work Plaintiff performed.

24. At all times relevant to this Complaint, Defendant Lamm Farms was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

25. At all times relevant to this Complaint, Defendant Alvarado was an employer of H-2A workers, including the Plaintiff, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

26. At all times relevant to this Complaint, Defendant Alvarado was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

27. At all times relevant to this Complaint, Defendant Gonzalez was an employer of H-2A workers, including the Plaintiff, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

28. At all times relevant to this Complaint, Defendant Gonzalez was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

29. At all times relevant to this Complaint, Unknown Defendant was an employer of Plaintiff as that term is defined in and by the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5), with respect to the construction work he performed.

30. At all times relevant to this Complaint, Unknown Defendant was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

31. At all times relevant to this Complaint, Defendant Real Constructions was an employer of Plaintiff, as that term is defined in and by the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5), with respect to the construction work Plaintiff performed.

32. At all times relevant to this Complaint, Defendant Real Constructions was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

33. At all times relevant to this Complaint, Agricultural Defendants were the joint employers of Plaintiff in relation to all agricultural work performed by Plaintiff, within the meaning of 29 U.S.C. §§ 203(d) and (g), 20 C.F.R. §§ 655.103(b), 655.1300(c), and 29 C.F.R. § 791.2, and N.C. Gen. Stat. § 95-25.2(3).

34. At all times relevant to this Complaint, Construction Defendants were the joint employers of Plaintiff in relation to all construction work performed by Plaintiff, within the meaning

PAGE 6

of 29 U.S.C. §§ 203(d) and (g), 20 C.F.R. §§ 655.103(b), 655.1300(c), and 29 C.F.R. § 791.2, and N.C. Gen. Stat. § 95-25.2(3).

FACTUAL ALLEGATIONS

**H-2A Program Background**

35. The H-2A visa program allows agricultural employers in the United States to import foreign workers to perform agricultural labor of a temporary nature in the U.S. Before issuing an H-2A visa, the Department of Labor ("USDOL") must certify that (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly situated U.S. workers. Foreign workers admitted under this program are commonly known as "H-2A workers."

36. The H-2A program is exclusively for the employment of individuals to perform agricultural work.

37. The H-2A regulations set the minimum benefits, wages, and working conditions that the employer must offer to avoid an adverse effect upon U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

38. Employers seeking to employ H-2A workers must agree to abide by all the requirements contained in the H-2A regulations, 20 C.F.R. Part 655, Subpart B.

39. The H-2A regulations require employers to disclose in the job offer all deductions that the employer will make from their paychecks unless they are required by law. Such deductions may not result in a profit to the employer or any affiliated person and may not be primarily for the benefit or convenience of the employer.

PAGE 7

40. Undisclosed or unauthorized deductions or kickbacks made directly or indirectly to the employer may not reduce an H-2A worker's pay below the adverse effect wage rate (AEWR).

41. In addition, an H-2A employer must offer and provide each worker with three meals per day or provide the workers with free and convenient cooking facilities.

42. H-2A employers are not allowed to charge for meals if the charge is not disclosed to the workers as part of the job offer.

43. When an H-2A employer discloses that it will provide meals, they may not charge more than a maximum allowable charge that is set by federal regulation.

44. Employers must provide their H-2A employees with a written work contract containing all of the job offer requirements in 20 C.F.R. § 655.122. If the employer fails to provide a written contract, the required terms of the job offer and application for temporary employment certification become the terms of a contract between the employer and H-2A worker.

**U.S. Work Agreement**

45. The Agricultural Defendants jointly employed Plaintiff Axel Enrique Campos Arroyo to perform agricultural work for them from approximately June 30, 2022, through until approximately August 24, 2022.

46. The Construction Defendants jointly employed Plaintiff Axel Enrique Campos Arroyo to perform construction work for them from approximately July 21, 2022, through until approximately August 24, 2022.

47. Pursuant to the job order (Form ETA 790) filed by Defendants Alvarado and Gonzalez, Agricultural Defendants offered to and agreed to pay Plaintiff $14.16/hour for all work he performed for Agricultural Defendants during the term of his H-2A job contract.

48. In addition, on or around the time Plaintiff arrived to the United States to perform work for the Agricultural Defendants, Agricultural Defendants informed Plaintiff, through Gonzalez, that they would pay Plaintiff a wage of between $14 and $16 per hour and would also provide plaintiff with housing. *See* Exhibit A.

49. Defendants Alvarado and Gonzalez applied for and received temporary labor certification for 24 H-2A workers to work in North Carolina for Alvarado and Lamm Farms from June 25, 2022 to December 25, 2022 in a variety of crops and greenhouse work. The employer certification portion of that application or job order ("June 2022 contract" or "June 2022 job order") was signed by Beatriz Mandujano Alvarado, the registered agent for Alvarado, on behalf of Alvarado. Exhibit A.

50. The June 2022 contract, which was signed under penalty of perjury by Defendant Alvarado's Harvesting, LLC, included the following terms:

    a. The crop(s) or agricultural activity included in the contract was:

        i. Flue-Cured Tobacco paid $14.16 per hour

        ii. Pull Weeds/Chop paid $14.16 per hour

        iii. Hand-harvested cukes paid piece rate, $1.00 per 5/8 bu. bucket;

    b. Employer will furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals;

    c. Employer will pay $14.16 per hour for hourly work;

PAGE 9

d.  Employer will reimburse transportation and subsistence expenses in accordance with 20 C.F.R. § 655.122(h). Inbound transportation will be reimbursed at the end of the first work week;

e.  The employer and its agents have not sought or received payment of any kind from any employee subject to 8 U.S.C. § 1188 for any activity related to obtaining H-2A labor certification, including payment of the employers attorneys fees, application fees, or recruitment costs, as prohibited by 20 C.F.R. § 655.135(j). Exhibit A.

51. Upon information and belief, Defendants Alvarado and Gonzalez knew the assurances were false at the time that they swore that the assurances were accurate.

52. Upon information and belief, Defendants Alvarado and Gonzalez did not intend to comply with the assurances sworn to in the June 2022 job order.

53. At all times relevant to this complaint Defendant Lamm Farms was listed as the sole fixed site employer on the June 2022 ETA-790 job order submitted by Defendants Alvarado and Gonzalez.

54. Defendant Lamm Farms has consistently participated in the H-2A program each year from at least 2018 to 2023, either by directly petitioning for foreign labor to work at Lamm Farms or by furnishing fixed-site operation work contracts to an H-2A Labor Contractor, enabling such contractor to petition for foreign labor to furnish to Lamm Farms.

55. For the consecutive years of 2018, 2019, 2020, 2021, and 2022, Defendant Lamm Farms, or the H-2A Labor Contractor that Lamm Farms contracted with to furnish H-2A labor to it, utilized the services of attorney Andrew Jackson of Andrew Jackson Law of Clinton,

PAGE 10

North Carolina ("Andrew Jackson") as its agent to prepare and file their H-2A applications with the required federal and state agencies.

56. In 2022, Lamm Farms more than doubled their H-2A workforce of the prior year.

57. In 2021, Lamm Farms, by and through Defendants Alvarado and Gonzalez, had petitioned for approximately 550 H-2A workers. In 2022, Lamm Farms, by itself and/or through Defendants Alvarado and Gonzalez, petitioned for approximately 1,269 H-2A workers.

58. Upon information and belief, by furnishing its respective fixed-site operation work contracts to Defendants Alvarado and Gonzalez, Lamm Farms was able to avoid certain costs of business associated with seeking H-2A Temporary Employment Certification to directly employ foreign workers in 2022 to perform farm labor on its farms, including the recruitment costs, the costs of H-2A workers' visa-processing and inbound travel expenses, other transportation costs, the cost of workers' compensation coverage, and the cost of the visa processing agent fees.

59. In 2022, Lamm Farms knew or should have known that the Defendants Alvarado and Gonzalez would be unable to comply with the minimum requirements of the FLSA, NCWHA, and H-2A program, and other applicable federal and state laws and regulations for their 2022 H-2A migrant labor crews, for at least the following reasons:

    a. Because of their direct participation in the H-2A program in prior agricultural seasons, Lamm Farms was aware of the financial and other obligations required of H-2A employers to comply with the requirements of the program and that a significant portion of those financial obligations occur just prior to and in the beginning weeks of the harvest season;

PAGE 11

b.  Lamm Farms knew or should have known that the Defendants Alvarado and Gonzalez would be required to reimburse an H-2A workforce of 24 workers for their travel and visa-related costs in addition to paying their wages after their first workweek, a workforce of nearly double the size of the workforce recruited and employed by Alvarado Harvesting and Gonzalez for Lamm Farms in the previous year;

c.  Upon information and belief, Lamm Farms failed to adequately vet Defendants Alvarado and Gonzalez's financial fitness and business model before providing them work contracts enabling Defendants Gonzalez and Alvarado to dramatically increase the size of their H-2A workforce in 2022 for their financial gain.

**Plaintiff's Travel to the United States of America**.

60. Sometime in the first half of 2022, The Agricultural Defendants instructed Plaintiff to call Attorney Mario Alberto Ramos, located in Monterrey, Mexico.

61. Pursuant to the direction of the Agricultural Defendants' agent(s) in Mexico, Plaintiff financed his travel at his own expense from his village to the U.S. Consulate in Monterrey, where he and his co-workers waited for their visas to be issued.

62. The Agricultural Defendants' agent, Attorney Ramos, instructed workers how to conduct themselves in the visa interview, and when and how to depart for the job in North Carolina.

63. The Agricultural Defendants, through their agent Attorney Ramos, required Plaintiff to pay the cost of his H-2A visa.

64. The Agricultural Defendants, through their agent Attorney Ramos, required Plaintiff to pay for the cost of lodging for several nights in Monterrey near the Consulate designated by the Agricultural Defendants.

65. The Agricultural Defendants, through their agent(s), then transported Plaintiff from the border to North Carolina. At the border crossing, the Agricultural Defendants required Plaintiff to pay the border crossing fee in the amount of $6.

66. The Agricultural Defendants' failure to pay or reimburse Plaintiff for the costs relating to Plaintiff's recruitment, travel from the recruitment site to the place of employment, and the associated visa application fees caused Plaintiff to incur debt and compelled him to continue working for Agricultural Defendants in order to pay off that debt.

### Plaintiff's Work in North Carolina

67. The Agricultural Defendants did not reimburse Plaintiff for any of his inbound travel or related expenses during the first workweek, or ever. Because of this failure to reimburse, Plaintiff's earnings in his paycheck for that first workweek amounted to less than the federal minimum wage and less than the promised AEWR.

68. On or around June 30, 2022, the Agricultural Defendants began to jointly employ Plaintiff Campos Arroyo in agricultural labor including cultivation and harvesting of sweet potatoes, tobacco, and cucumbers.

69. On or around July 20, 2022, Defendants Alvarado and Gonzalez jointly informed Plaintiff that, instead of performing agricultural work for the Agricultural Defendants, he would begin reporting to a construction site to perform construction work for a company owned and operated by a relative of Gonzalez.

PAGE 13

70. Between approximately July 21, 2022 to approximately August 24, 2022, during the course of Plaintiff's construction employment for the Construction Defendants, Construction Defendants jointly directed Plaintiff on where and when to report for construction work.

71. During the course of Plaintiff's employment for the Agricultural Defendants, the Agricultural Defendants determined the rate, method and manner of Plaintiff's pay and otherwise controlled Plaintiff's working conditions.

72. The Agricultural Defendants jointly supervised the agricultural work Plaintiff performed, including by instructing Plaintiff as to what work he was required to perform as well as how he was required to perform the work.

73. Upon information and belief, for all agricultural work performed by Plaintiff, the Agricultural Defendants jointly set and determined the hours Plaintiff worked and the times which he was required to arrive to work and when he was to leave work.

74. In addition, Defendants Gonzalez and Alvarado, throughout Plaintiff's time as an employee in North Carolina, set and determined the hours and method and rate of pay for Plaintiff's work, regardless of whether he was performing agricultural or construction work.

75. Throughout the duration of Plaintiff's work for Defendants, Plaintiff was engaged in interstate commerce or in the production of goods for interstate commerce or was employed by an enterprise engaged in interstate commerce.

76. Although Agricultural Defendants had offered, promised, and were legally required by the H-2A regulations to pay Plaintiff a wage of at least $14.16/hour for all hours he worked as an agricultural worker, the Agricultural Defendants, by either shaving the time

Plaintiff worked, or in other words not paying Plaintiff for all compensable hours he worked, or by failing to pay him the full amount of his promised wage(s), actually paid Plaintiff less than $14.16/hour for each and every hour he worked as an agricultural worker.

77. When Plaintiff and his co-workers noticed on their pay stubs that they were not being paid for all the hours they spent performing agricultural or related work, Plaintiff and the other workers complained to Defendant Gonzalez, who justified the discrepancy in the hours worked by Plaintiff and his H-2A co-workers by stating, in part, that they were being paid a higher wage than their companion non-H-2A workers, because their companion workers did not possess work authorization.

78. For the approximate first month of Plaintiff's employment, the Agricultural Defendants directed Plaintiff to work exclusively in agriculture for 6 days a week for approximately 13 to 14 hours a day, during which time Agricultural Defendants employed Plaintiff to harvest sweet potato, cucumbers, green beans, and tobacco. For approximately two days of the week, Plaintiff harvested sweet potatoes, cucumbers, and green beans. During the remaining days the Agricultural Defendants employed Plaintiff to harvest tobacco.

79. Following the period of time when Plaintiff worked exclusively for the Agricultural Defendants, from approximately July 21, 2022 until August 24, 2022, the Construction Defendants jointly employed Plaintiff to perform construction work Monday through Saturday of each week therein.

80. In addition, on all Sundays between the dates of July 21, 2022 and August 24, 2022, the Agricultural Defendants jointly employed Plaintiff to perform agricultural work.

**Defendants Gonzalez and Alvarado Confiscated and Possessed Plaintiff's Passport**

PAGE 15

81. After Plaintiff arrived at the employer-provided housing in late June of 2022, Defendant Gonzalez demanded that all of the workers provide to him their passports, claiming that he needed the passports to begin the social security process.

82. Throughout Plaintiff's employment for Defendants, Defendants Gonzalez and Alvarado maintained possession and control over Plaintiff's and all the other workers' passports.

83. Defendants Alvarado and Gonzalez confiscated Plaintiff's and all of the other workers' passports for the purpose of restricting Plaintiff's and the other workers' ability to leave the work site, to coerce Plaintiff and the other workers to continue working for them, and or prevent Plaintiff and the other workers escape their employment with Agricultural Defendants.

84. On or around the time Plaintiff began work for the Agricultural Defendants, Defendants Alvarado and Gonzalez informed Plaintiff and his co-workers that their passports had a tracking chip imbedded within them, and that Defendants would be aware of their location if they ever took their passports and left their employment with the Agricultural Defendants, and the Agricultural Defendants would know exactly where they went.

85. In addition, Defendants Alvarado and Gonzalez informed Plaintiff and his coworkers that if they were to leave their employment with the Defendants, Defendants Alvarado and Gonzalez would inform immigration authorities and would have them sent back to Mexico the very same day they left.

86. Defendants Alvarado and Gonzalez made these statements to Plaintiff and his co-workers with the express intent to maintain intimidation and control over Plaintiff and his co-workers and to prevent Plaintiff and his co-workers from objecting to their working conditions or choosing to leave their employment with the Agricultural Defendants.

**Threats of Deportation**

87. In addition to paragraphs 85 and 86 above, throughout the entirety of Plaintiff's employment, Defendant Gonzalez yelled at and threatened Plaintiff and his co-workers with deportation when they complained about their working conditions.

88. Defendant Gonzalez threatened to call the police and immigration officials and to have workers deported and arrested if they escaped his employ.

89. In addition, throughout the course of Plaintiff's employment with the Agricultural Defendants, Gonzalez, acting on behalf of himself and Defendant Alvarado, repeatedly threatened Plaintiff and the other workers that if any of the workers left, they would report them to the U.S. government so that they would be made inadmissible for lawful entry into the U.S. in the future, or "blacklisted from future H-2A employment."

90. Defendants Alvarado's and Gonzalez's confiscation of Plaintiff's and the other workers' passports, along with their continued and repeated threats that if Plaintiff or any of the other workers objected to any working condition they would be deported, caused Plaintiff to reasonably fear for his safety and status if he decided to flee from the labor camp or his employment.

91. Throughout the course of Plaintiff's employment with the Agricultural Defendants, Defendants Alvarado and Gonzalez transported Plaintiff and the other workers between the worksites and their labor camp housing and never told Plaintiff or the other workers the name or address of the worksites where they worked for Agricultural Defendants.

92. Plaintiff does not know the name or exact location of the different work sites where he performed agricultural labor for Agricultural Defendants because he was completely unfamiliar with the area, the work sites were in isolated, rural areas lacking distinctive

geographic points of reference, and because he was always transported there by his employers.

**Forced Purchase of Lunch**

93. During his employment for the Agricultural Defendants, Defendants Alvarado and Gonzalez, through Beatriz Alvarado, sold lunches to Plaintiff and other H-2A workers. A lunch meal cost approximately $10, however, at times Alvarado and Gonzalez charged a higher price for the meals. All meals were purchased on credit from Defendants Alvarado and Gonzalez, who jointly forced Plaintiff and the other workers to pay them for these meals when Plaintiff and the other workers cashed their checks.

94. Defendants Alvarado and Gonzalez forced Plaintiff to purchase meals from them for three weeks beginning on or around approximately June 30, 2022. Plaintiff was forced to purchase meals for the entirety of his time working exclusively in agriculture.

**Plaintiff's Non-Agricultural Work**

95. On or around approximately July 21, 2022 Defendants Gonzalez and Alvarado ordered Plaintiff to perform construction work outside of the confines and permits of the H-2A program and the job order presented by Defendants Lamm Farms and Alvarado to the United States Department of Labor ("USDOL").

96. Defendant Lamm Farms explicitly ratified this unlawful modification of Plaintiff's H-2A contract by consenting to Plaintiff's work for the construction company during this period of time, and by requiring him to only work one day a week for Lamm Farms from July 21, 2022 onward.

PAGE 18

97. During Plaintiff's employment, Unknown Defendant, Real Constructions, Gonzalez, and Alvarado directed Plaintiff to work in construction.

98. The Construction Defendants required Plaintiff to drive himself and three other workers back to their dwellings from the work site. Plaintiff drove 2.5 hours, 6 days a week totaling approximately 15 hours of driving per week. Real Constructions charged Plaintiff, along with the others he transported, for the gasoline used to reach the construction site. Construction Defendants did not pay Plaintiff for the time he spent transporting workers to their residences back from the construction site, as he was directed to do by Construction Defendants.

99. At this point, and only at this point, Defendant Gonzalez returned to Plaintiff his passport for the sole purpose of providing Plaintiff with apparent permission to drive to and from the construction site.

100. During the time period where Construction Defendants employed Plaintiff to perform construction work, the Construction Defendants required Plaintiff to leave for the construction site at around 4:30 a.m. and to arrive between 5:00 a.m. and 6:00 a.m.

101. Once Plaintiff arrived at the construction site, the Construction Defendants required Plaintiff and the other workers to write down their name on a check-in list. At that point Unknown Defendant's supervisor would instruct Plaintiff as to the day's work assignment.

102. Unknown Defendant's supervisor provided Plaintiff and the other construction workers with notebooks every day and the Construction Defendants instructed Plaintiff and the other workers to write down their hours in these notebooks and turn them in at the end of the day. An individual named Jose would then take a picture of the notebook entry with

PAGE 19

each worker's hours. Construction Defendants required Plaintiff to work for approximately 60 hours per week, from July 21 to August 24, 2022, not including the time Construction Defendants employed Plaintiff to transport other workers from the construction site.

103. Upon information and belief, a few days prior to August 24, 2022, Attorney Ramos called Gonzalez on speaker phone. During that phone call, Gonzalez reported to Ramos that it appeared that Plaintiff wanted to leave the job. Gonzalez stated that he was going to move Plaintiff's sleeping quarters closer to Gonzalez's residence, where Gonzalez had more people he trusted.

104. Gonzalez directly told Plaintiff that he would be moved to living quarters that were closer to Gonzalez's home and where he could more closely monitor Plaintiff's movements.

105. Upon hearing this conversation, Plaintiff reasonably began to fear for his safety and freedom. Plaintiff responded to Gonzalez's demand by stating that he needed to collect his belongings before moving to the other residence.

106. On or around August 24, 2022, at approximately midnight, Plaintiff, without Defendants' knowledge, left his sleeping quarters and walked to a closed down bus station, where Plaintiff's brother, who lived in Montana, ordered a van to pick Plaintiff up from the bus station and drive Plaintiff to a hotel in Raleigh, North Carolina. It was only through these actions, conducted without Defendants' knowledge, that Plaintiff was able to escape his employment with Defendants.

## **Defendants Alvarado's and Gonzalez's Retaliation Against Plaintiff**

107. Following Plaintiff's escape from his employment with Defendants, Defendant Gonzalez repeatedly called Plaintiff to find out where he was, but Plaintiff did not answer his calls.

108. When Defendant Gonzalez was unable to reach Plaintiff via telephone, Defendants Alvarado and Gonzalez, upon information and belief, instructed Plaintiff's former co-workers to call Plaintiff.

109. Pursuant to Defendant Alvarado's and Gonzalez's instructions, Plaintiff's co-workers called Plaintiff to inform him that Defendants Gonzalez and Alvarado were going to contact immigration authorities to have him deported.

110. Pursuant to Defendants Gonzalez's and Alvarado's instructions, Plaintiff's former co-workers informed Plaintiff that Defendant Gonzalez knew Plaintiff's family members and where they lived and that Defendants Alvarado and Gonzalez would harm them.

111. In a subsequent communication, Plaintiff's former co-workers informed Plaintiff that Defendants Gonzalez and Alvarado had already reported Plaintiff to the sheriff and when the sheriff located him, the sheriff would have him deported.

**U.S. Department of Labor Wage and Hour Division Investigation**

112. Approximately one month after Plaintiff escaped his employment with the Defendants, the United States Department of Labor's Wage and Hour Division (WHD) began an investigation of Defendant Alvarado.

113. Following the commencement of the WHD's investigation, Defendants Alvarado and Gonzalez ordered Plaintiff not to participate in the WHD investigation.

114. Specifically, Defendants Gonzalez and Alvarado asked Plaintiff what it would take to withdraw his WHD complaint. Defendants Alvarado and Gonzalez offered Plaintiff money to "drop" the investigation.

PAGE 21

115. Plaintiff informed Defendants Alvarado and Gonzalez that he would not accept anything from Defendants in exchange for dropping the investigation, and he was going to continue to participate in the WHD investigation.

116. Similarly, Plaintiff's former co-workers reached out to Plaintiff and asked him to withdraw the WHD complaint, because Defendants Gonzalez and Alvarado had informed them that if the WHD complaint was not withdrawn, then Defendants Alvarado and Gonzalez would have all the workers deported to Mexico, including Plaintiff.

117. Pursuant to these threats of retaliation, three of Plaintiff's former co-workers independently called Plaintiff to ask him to cease his participation in the WHD investigation.


## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Agricultural Defendants–Violation of Fair Labor Standards Act ("FLSA") Minimum Wage Provisions – 29 U.S.C. § 206

118. Plaintiff hereby incorporates all previous paragraphs of this Complaint, as though set forth fully herein.

119. From approximately June 30, 2022 until approximately August 24, 2022, Plaintiff was an employee of Agricultural Defendants within the meaning of 29 U.S.C. § 203(e)(1).

120. From approximately June 30, 2022, until approximately August 24, 2022, Agricultural Defendants were the employers of Plaintiff within the meaning of 29 U.S.C. § 203(d).

121. Agricultural Defendants willfully failed to fully reimburse Plaintiff in his first paycheck for expenses incurred primarily for benefit of Agricultural Defendants in violation of the FLSA.

122. Agricultural Defendants jointly violated 29 U.S.C. § 206 by failing to pay Plaintiff the minimum wage rate of at least $7.25/hour for all the hours he worked for them.

123. During all times material to this Complaint, Agricultural Defendants' actions in not paying Plaintiff the minimum wage under federal law were willful.

124. Agricultural Defendants' failure to pay Plaintiff at the lawful minimum wage rate while Plaintiff was an employee was not based on good faith or reasonable grounds, or a belief that such failure was not in violation of the FLSA. Pursuant to 29 U.S.C. § 216(b), Plaintiff is therefore entitled to an award of his unpaid minimum wages for his first week of employment with Defendants, an equal sum in liquidated damages and the reasonable costs and attorneys' fees associated with his wage claims.

## SECOND CAUSE OF ACTION
## Construction Defendants' Violation of FLSA Overtime Provisions- 29 U.S.C. § 213(b)

125. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as though set forth fully herein.

126. From approximately July 21, 2022 until approximately August 24, 2022, Plaintiff was jointly employed by Construction Defendants within the meaning of 29 U.S.C. § 203(e)(1).

127. From approximately July 21, 2022 until approximately August 24, 2022, Construction Defendants jointly employed Plaintiff within the meaning of 29 U.S.C. § 203(d).

PAGE 23

128. Construction Defendants jointly employed Plaintiff to perform construction work in Apex, North Carolina from approximately July 21, 2022 until approximately August 24, 2022 for approximately 75.5 hours a week.

129. Construction Defendants jointly paid Plaintiff a flat rate of $14/hour for all hours Plaintiff worked as a construction worker, regardless of how many hours Plaintiff worked during a given work week.

130. The work Plaintiff performed as a construction worker was not covered by any overtime exemption of the FLSA. *See* 29 U.S.C. §§ 207 & 213.

131. Further, Construction Defendants violated the overtime provisions of the FLSA, by failing to pay Plaintiff at the required overtime wage rate for hours worked over forty in the several workweeks in which Plaintiff performed non-agricultural construction work.

132. Construction Defendants' failure to pay the overtime wage rate of one time and a half Plaintiff's regular rate for all hours worked over forty in workweeks in which Plaintiff performed non-agricultural work was not based on a good faith belief that Construction Defendants' actions in doing so were in compliance with the law.

133. Construction Defendants' failure to pay Plaintiff his duly earned overtime wages constituted willful violations of the FLSA and its accompanying regulations. As such, Construction Defendants' failure to pay Plaintiff the applicable overtime was willful within the meaning of 29 U.S.C. § 255.

134. As a consequence of Construction Defendants' willful violations of Plaintiff's rights under the FLSA, Plaintiff is entitled to an award of unpaid overtime wages, plus an equal amount in liquidated damages, and costs and attorneys' fees pursuant to 29 U.S.C. § 216(b).

## THIRD CAUSE OF ACTION
### Defendants' Violation of North Carolina Wage and Hour Act (NCWHA) - N.C. Gen. Stat. § 95-25.1, et seq.

135. Plaintiff hereby incorporates all previous paragraphs of this Complaint as though set forth fully herein.

136. From approximately June 30, 2022 until approximately August 24, 2022, Agricultural Defendants were the joint employers of Plaintiff within the meaning of N.C. Gen. Stat. § 95-25.2(5).

137. From approximately June 30, 2022, until approximately August 24, 2022, Plaintiff was jointly employed by Agricultural Defendants within the meaning of N.C. Gen. Stat. § 95-25.2(3).

138. From approximately July 21, 2022, until approximately August 24, 2022, Construction Defendants were the joint employers of Plaintiff within the meaning of N.C. Gen. Stat. § 95-25.2(5).

139. From approximately July 21, 2022 until approximately August 24, 2022, Plaintiff was jointly employed by Agricultural Defendants within the meaning of N.C. Gen. Stat. § 95-25.2(3).

140. Agricultural Defendants agreed to and were legally obligated to pay Plaintiff at least the established adverse effect wage rate (AEWR) of $14.16/hour for all hours Plaintiff worked as an agricultural worker for Agricultural Defendants.

141. During all times in which Agricultural Defendants employed Plaintiff as an agricultural worker, Agricultural Defendants paid Plaintiff a wage of approximately $11/hour, by

PAGE 25

either reducing his hourly wage and/or by not crediting him with payment or not paying him for all time he spent working for Agricultural Defendants.

142. Agricultural Defendants also failed to compensate Plaintiff the promised wage for all hours worked by requiring him to kick back part of his wages for illegal meal charges, which additionally caused his wages to fall below $14.16/hour for the hours he worked during his first approximate 3 weeks of employment for Agricultural Defendants.

143. From approximately July 21, 2022 until approximately August 24, 2022, Construction Defendants failed to pay Plaintiff the promised wage of $14/hour for all hours he worked, as they did not pay Plaintiff any wages for the time he spent transporting other workers to and from the construction work sites.

144. Agricultural Defendants jointly failed to pay Plaintiff all of his wages when they were due at the promised wage rate disclosed to him of $14.16/hour for all agricultural work he performed. Pursuant to N.C. Gen. Stat. § 95-25.13(1)-(2), Plaintiff is entitled to recover those wages.

145. Construction Defendants jointly failed to pay Plaintiff all of his wages when they were due at the promised wage rate disclosed to him of $14/hour for all construction work he performed. Pursuant to N.C. Gen. Stat. § 95-25.13(1)-(2), Plaintiff is entitled to recover those wages.

146. As a result of these actions, Defendants violated Plaintiff's rights under N.C. Gen. Stat. § 95-26.6.

147. As a result of Defendants' aforementioned violations, Plaintiff is entitled to an award of damages in the form of unpaid wages and liquidated damages that may be recovered from Defendants under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

PAGE 26

## FOURTH CAUSE OF ACTION
### Agricultural Defendant State Law Contract Claims

148. Plaintiff hereby incorporates all previous paragraphs of this Complaint as though set forth fully herein.

149. In approximately April 2022, Defendant Alvarado and Defendant Gonzalez offered, on behalf of Agricultural Defendants, employment to Plaintiff through their agent, Attorney Ramos, on the terms and conditions set out in the job order and application for temporary employment certification.

150. Plaintiff accepted agricultural Defendants' offer between April and May of 2022 by agreeing to pay for the H-2A visa application fee, by traveling to the United States, and by beginning work for Agricultural Defendants on approximately June 30, 2022.

151. Agricultural Defendants entered into a contract with Plaintiff in 2022, the terms of which were the required terms of the job order and application for temporary employment certification. 20 C.F.R. §§ 655.121, 655.122, and 655.135.

152. The obligation of Agricultural Defendants to pay Plaintiff at least the established AEWR of $14.16 was a material condition of Defendants' offer of employment to Plaintiff.

153. The obligation of Agricultural Defendants to reimburse Plaintiff for all travel costs related to his travel from his point of recruitment to the work site was also a material condition of Agricultural Defendants' offer to plaintiff.

154. The job order's guarantee that Plaintiff would be employed to perform only agricultural labor was not only a material condition of Agricultural Defendants' contract with Plaintiff,

but is also a material and mandatory requirement of Agricultural Defendants' participation in the H-2A program.

155. Agricultural Defendants breached their employment contract with Plaintiff by not paying him at the contract wage rate, not compensating him for all hours he worked, and requiring him to pay for an undisclosed meal plan.

156. Agricultural Defendants also breached their contract with Plaintiff by delegating him to perform construction work not covered by the contract, nor permitted by the material conditions of the Department of Labor's approval of the Agricultural Defendants' job order.

157. Agricultural Defendants' breach of their employment contract with Plaintiff caused substantial injuries to Plaintiff.

158. Agricultural Defendants are liable to Plaintiff for damages that arose naturally and according to the usual course of consequences from the Defendants' breach, as provided by federal common law and/or North Carolina common law, and prejudgment interest.


**FIFTH CAUSE OF ACTION**
**Agricultural Defendants' Violation of the Trafficking Victims Protection**
**Reauthorization Act ("TVPRA"),**
**18 U.S.C. § 1589(a)**


159. Plaintiff hereby incorporates all previous paragraphs of this Complaint as though set forth fully herein.

160. Congress passed the Victims of Trafficking and Violence Protection Act in 2000 ("TVPA"). Pub. L. No. 106-386, 114 Stat. 1466 (2000) (codified as amendment in Title 22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code.) The TVPA has been

PAGE 28

reauthorized several times in the years since. Through its text and legislative history, Congress demonstrated a strong intent to provide a means of recovery for victims of labor exploitation by allowing them to pursue civil actions for human trafficking violations.

161. The Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589, *et seq.*, criminalizes labor trafficking, e.g. peonage, slavery, involuntary servitude, and forced labor. Separately, § 1595 of the TVPRA provides victims of labor trafficking with civil remedies against the perpetrators of human labor trafficking and also against the beneficiaries of labor trafficking. *See* 18 U.S.C. § 1595(a).

162. 18 U.S.C. § 1595(a) sets the standard for civil liability under the TVPRA. That section provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially, or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

163. Under the 2003 version of 18 U.S.C. § 1595(a), only those criminally liable under § 1590 could be held civilly liable under 1595. However, in 2008, U.S.C. § 1595(a) was intentionally amended with substantially different language that created a category of defendants that could be held liable civilly even in the absence of criminal culpability. By amending 18 U.S.C. § 1595(a) in 2008, Congress required "whoever" (i.e. all businesses,) to comply with the new law or face civil liability. This amendment to the country's systemic human trafficking legislation necessitated an evolution from the business and

PAGE 29

commercial sector which for decades have enabled, empowered, harbored, held, facilitated, benefitted from financially or otherwise, and/or any combination of the foregoing from labor trafficking.

164. Under the TVPRA and the TVPA, any individuals and/or entities are civilly liable for a labor trafficking victim's damages if they: (1) knowingly benefitted; (2) from participating in a venture; (3) that they knew or should have known engaged in forced labor." 18 U.S.C. § 1595(a).

165. It is a violation of the TVPRA to "knowingly provide or obtain the labor or services of a person… by means of serious harm or threats of serious harm…; by means of the abuse or threatened abuse of the law or legal process; or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm…" 18 U.S.C. § 1589(a).

166. The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious… to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm. 18 U.S.C. § 1589(c)(2).

167. Agricultural Defendants jointly and knowingly obtained the labor of Plaintiff by threats of abuse of the legal process and other forms of psychological restraint against Plaintiff.

168. Agricultural Defendants knowingly provided and/or obtained Plaintiff's labor and services by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that if he did not perform such labor or services, Plaintiff would suffer legal consequences, harm, or physical restraint, including but not limited to arrest and deportation.

169. Agricultural Defendants compelled Plaintiff to work exorbitant hours by threatening abuse of the legal process. Agricultural Defendants exploited Plaintiff's vulnerability and state of indebtedness and directed, assisted, conspired, or acted in concert with each other to create and perpetuate a system of peonage and forced labor prohibited by 18 U.S.C. §§ 1589 and 1590.

170. Agricultural Defendants used abuse of and threats of abusing the legal process, e.g., Agricultural Defendants and their agent conspired to threaten to call immigration authorities and the police if Plaintiff complained about the working conditions, false promises made by the Agricultural Defendants' concerning Plaintiff's wages and working conditions, Agricultural Defendants' withholding of documents, by subjecting Plaintiff to indebtedness, and controlling Plaintiff's movements and living location, which constituted a pattern of threats and abuse to cause Plaintiff to believe that failure to obey would cause Plaintiff, and/or his family back in Mexico as well as those family members who reside locally, to suffer serious harm.

171. Agricultural Defendants knowingly obtained Plaintiff's labor through abuse of the legal process by including false information in the Clearance Order and thereby using the H-2A Program in a manner for which the law was not intended.

172. Agricultural Defendants also knowingly obtained Plaintiff's labor through abuse of the legal process by confiscating Plaintiff's passport thereby making Plaintiff susceptible to coercion, threats of deportation, and effectively unable to flee from the trafficking scheme.

173. Plaintiff suffered and continues to suffer emotional distress and financial distress due to Agricultural Defendants' coercive and fraudulent tactics resulting in Plaintiff's forced labor and trafficking.

PAGE 31

174. Because of these violations, Plaintiff has suffered injury and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

**SIXTH CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1, et seq., Against Defendants Alvarado and Gonzalez**

175. Plaintiff realleges and reincorporates the allegations in the preceding paragraphs as though set forth fully herein.

176. This civil claim is brought by Plaintiff pursuant to the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA) against Defendants Alvarado and Gonzalez for violations of N.C. Gen. Stat. §§ 75-1, et seq.

177. Defendants Alvarado and Gonzalez breached their contracts with Plaintiff in a manner that included substantial aggravating circumstances and acts of deception, including misrepresenting the nature of the work to be performed, the wage rate to be paid, and the fact of reimbursement for Plaintiff's travel, lodging, visa application costs, and border crossing fees, which caused substantial injury to Plaintiff.

178. Defendants Alvarado's and Gonzalez's policy or practice of unlawfully charging recruitment fees while signing written assurances that no such fees would be charged was an unfair act or practice within the meaning of the UDTPA. It was immoral, unethical, oppressive, deceptive, and offensive to public policy.

179. The foregoing conduct constitutes an activity "in or affecting commerce" within the meaning of the UDTPA.

180. As a result of the reliance of Plaintiff on Defendants' Alvarado's and Gonzalez's misrepresentations, unlawful acts, deceptive promises and unfair marketing and promises of payment, Plaintiff suffered damages, including emotional distress and unpaid wages.

181. Plaintiff is entitled to recover all damages resulting from Defendants Alvarado's and Gonzalez's unfair and deceptive conduct, as well as treble damages under N.C. Gen. Stat. § 75-16.

182. The foregoing conduct in violation of N.C. Gen. Stat. § 75-1, et seq., was willful, warranting an award of reasonable attorneys' fees to Plaintiff. N.C. Gen. Stat. § 75-16.1.


**SEVENTH CAUSE OF ACTION**
**Fraud in the Inducement - Defendants Alvarado and Gonzalez**


183. Plaintiff hereby incorporates all previous paragraphs of this Complaint, as though set forth fully herein.

184. This claim is brought by Plaintiff against the Defendants Alvarado and Gonzalez and arises under the common law of torts.

185. Defendants Alvarado and Gonzalez, personally and through their agents, knowingly included false misrepresentations in their 2022 job order (ETA-790). These false misrepresentations included, among other things:

   a. that Plaintiff would be paid $14.16 per hour for all of his hours of work each work week;

   b. that Defendants Alvarado and Gonzalez would pay and/or reimburse Plaintiff for the visa application and processing fees, transportation, lodging, border crossing, and subsistence expenses; and

PAGE 33

    c.   Plaintiff would be employed to perform only agricultural-related work during the tenure of his H-2A visa.

186. These representations were false and were known by Defendants Alvarado and Gonzalez to be false at the time that the Plaintiff was recruited by Defendants Alvarado and Gonzalez

187. Defendants Alvarado and Gonzalez made these false representations reasonably calculating to deceive Plaintiff and other workers.

188. Defendants Alvarado and Gonzalez made these false misrepresentations intending that Plaintiff and other workers rely upon them in order to induce the Plaintiff and the other workers to pay the recruitment fees that they demanded and to front significant visa and travel-related costs to travel from their hometowns to North Carolina to work for Defendants.

189. Defendants Alvarado's and Gonzalez's false representations were material as they concerned the essential terms of Plaintiff's employment.

190. In reliance upon Defendants Alvarado's and Gonzalez's false representations, Plaintiff paid large sums of money to the Defendants Alvarado and Gonzalez for their required fees, and, in order to pay these fees, Plaintiff was required to borrow the money.

191. Plaintiff was injured as a result of his reliance on Defendants Alvarado's and Gonzalez's false statements and misrepresentations, which caused him to pay large sums of money to Alvarado and Gonzalez, leave his home, family, and employment in Mexico and come to the U.S. where he was not provided with his promised wages and working conditions.

192. As a result of Defendants Alvarado's and Gonzalez's false representations, Plaintiff suffered damages.

PAGE 34

## EIGHTH CAUSE OF ACTION
## Negligent Misrepresentation- Defendants Alvarado and Gonzalez

193. Plaintiff hereby realleges and reincorporates all previous paragraphs as though set forth fully herein.

194. This claim is brought by Plaintiff against Defendants Alvarado and Gonzalez and arises under the common law of torts.

195. Defendants Alvarado and Gonzalez, personally and through their agents, made written and oral material misrepresentations to Plaintiff while recruiting him as an H-2A worker for work with the Defendants in the U.S. These misrepresentations included, among other things:

    a. That Plaintiff would be paid $14.16 per hour for all of his hours of work each workweek;

    b. Defendants Alvarado and Gonzalez would pay and/or reimburse Plaintiff's visa application and processing fees, transportation, lodging, border crossing, and subsistence expenses; and

    c. Plaintiff would be employed to perform only agricultural-related work during the tenure of his H-2A visa.

196. Defendants Alvarado and Gonzalez failed to provide information to Plaintiff about the job that they knew may be material to Plaintiff's decision to incur significant expenses and travel to the U.S. to come work for Defendants.

197. In reliance upon Defendants Alvarado's and Gonzalez's misrepresentations, Plaintiff paid large sums of money to Defendants Alvarado and Gonzalez for their required fees, and, in order to pay these fees, Plaintiff was forced to borrow large sums of money.

PAGE 35

198. Plaintiff was injured as a result of his reliance on Defendants Alvarado's and Gonzalez's and their agents' false statements and misrepresentations, which caused him to pay large sums of money to Defendants Alvarado and Gonzalez, leave his home, family, and employment in Mexico and come to the U.S. where he was not provided with his promised wages and working conditions.

199. As a result of Defendants Alvarado's and Gonzalez's misrepresentations, Plaintiff suffered significant injury and harm.

## NINTH CAUSE OF ACTION
### Unlawful Retaliation – 29 U.S.C. § 215(a)(3)- Defendants Alvarado and Gonzalez

200. Plaintiff hereby incorporates and re-alleges the foregoing paragraphs as though set forth fully herein.

201. Pursuant to Section 15 of the Fair Labor Standards Act, it is unlawful for any entity to "discharge or in any other manner discriminate against an employee because such employee has filed any complaint or has instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

202. Defendants Alvarado and Gonzalez jointly violated Section 215(a)(3) of the FLSA by, among other things, threatening to harm Plaintiff or his family members if he provided facts or testimony in the WHD investigation regarding Defendants Alvarado's and Gonzalez's violations of the FLSA; by threatening to have Plaintiff arrested if he spoke with the WHD investigators; and, by threatening to have Plaintiff deported if he did not withdraw the WHD complaint and/or continued to participated in the WHD investigation of Defendant Alvarado's and Gonzalez's violations of the FLSA.

PAGE 36

203. As a result of Defendant Alvarado's and Gonzalez's violations of Section 215(a)(3) of the FLSA, Plaintiff suffered considerable injury, including, but not limited to, emotional distress.

204. Pursuant to Section 216(b) of the FLSA, Plaintiff is entitled to an award of actual and punitive damages as compensation for Defendant Alvarado's and Gonzalez's Violations of Section 215(a)(3) of the FLSA.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a) Declaring that Agricultural Defendants, by the acts and omissions described above, willfully violated Plaintiff's rights under the minimum wage provisions of the FLSA at 29 U.S.C. § 206(a).

b) Declaring that Construction Defendants, by the acts and omissions described above, willfully violated Plaintiff's rights under the overtime provisions of the FLSA at 29 U.S.C. § 207;

c) Granting judgment in favor of Plaintiff on his FLSA claims and awarding Plaintiff monetary damages for his unpaid minimum and overtime wages, plus liquidated damages in an equal amount, actual, consequential, and punitive damages for Defendant Alvarado's and Gonzalez's violations of Section 215(a)(3) of the FLSA, and interest, costs, and attorneys' fees, as provided by 29 U.S.C. § 216(b);

d) Declaring that Defendants, by the acts and omissions described above, violated Plaintiff's rights under the North Carolina Wage and Hour Act;

e) Granting judgment in favor of Plaintiff on his NCWHA claims and awarding Plaintiff monetary damages for unpaid promised wages, plus liquidated damages in an equal amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.22;

f) Granting judgment awarding Plaintiff actual and consequential damages for the Agricultural Defendants' breach of his employment contract;

g) Awarding Plaintiff pre-judgment interest on sums due under state law claims and post-judgment interest;

h) Awarding Plaintiff compensatory and punitive damages, in an amount to be determined at trial, as well as reasonable attorney's fees, and costs for Agricultural Defendants' violations of the TVRPA;

i) Awarding Plaintiff compensatory and punitive damages for Defendant Alvarado's and Gonzalez's fraud in the inducement;

j) Awarding Plaintiff compensatory and punitive damages in relation to Defendants Alvarado's and Gonzalez's negligent misrepresentation; and

k) Granting such injunctive, declaratory, and further relief as this Court deems just and appropriate.

Respectfully submitted this 28th day of July, 2023.

_/s/ Trent R. Taylor_
Trent R. Taylor
Mo. State Bar No. 63287
**FARMWORKER JUSTICE**
1126 16th Street NW, Suite LL101
Washington, DC 2006
T: (614) 584-5339

PAGE 38

Ttaylor@farmworkerjustice.org


*/s/ Aaron V. Jacobson*
Aaron V. Jacobson
N.C. State Bar No. 44065
Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Phone: (919) 856-2180
aaronj@legalaidnc.org


*Attorneys for Plaintiff*

PAGE 39